**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| DANA LYNN RIDGE and KARISSA ALBRECHT, <br><br> Plaintiffs, <br><br> v. <br><br> DYNASPLINT SYSTEMS, INC., <br><br> Defendant. | Case 1:14-cv-00378-GLR |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

Defendant Dynasplint Systems, Inc. ("DSI"), through counsel, submits this memorandum in support of its renewed motion pursuant to Fed. R. Civ. P. 56, and in accordance with the Court's Letter Opinion dated December 15, 2014, Doc. 59, for summary judgment in its favor on the claim presented by plaintiffs Dana Lynn Ridge and Karissa Albrecht under the Worker Adjustment and Retraining Notification (WARN) Act, 29 U.S.C. §§ 2101-09.

Because the undisputed material facts establish that the layoffs ordered by DSI on August 6, 2013 were necessitated by business circumstances that were not reasonably foreseeable and were outside its control, this Court should enter judgment for DSI as a matter of law. For the sake of efficiency, we assume the Court's familiarity with the background facts summarized in the parties' earlier briefing on this matter. *See* Doc. 9-1, at 1-5; Docs. 21, 24.

## I.   <u>Introduction</u>

With respect to DSI's business circumstances defense, this Court previously issued a detailed written opinion discussing the applicable law and precedents.  *See* Doc. 24.  The Court determined that material factual issues remained concerning whether DSI provided its employees "as much notice as practicable."  *Id.* at 3 (citing 29 U.S.C. § 2102(b)(3)).  The Court's analysis centered on a potential refinancing opportunity that DSI had pursued through a third-party lender, MidCap Financial LLC ("MidCap"), which in turn was tied to ongoing settlement discussions between DSI and lawyers from the Department of Justice over a potential settlement of a *qui tam* action against DSI.  The Court directed the parties to conduct limited discovery focused on these matters.  *Id.*

The parties have conducted discovery that clarifies the timeline of key events from June through August, 2013.  This has included: DSI's production of thousands of pages of relevant documents; extensive third-party document discovery; depositions of representatives of DSI, BB&T, MidCap, and third-party consultant BlackBriar Advisors LLC; and declarations from DSI's counsel who engaged in the settlement discussions with the DOJ lawyers, and from DSI's chief executive, Mr. Hepburn.  Although discovery concerning other factual issues has been stayed pending disposition of this motion, *see* Doc. 59, the current record is complete with respect to DSI's business circumstances defense.

4427741.1

## II.   Undisputed Material Facts

Exhibit 1 is a true copy of the letter that Mr. Hepburn provided to DSI employees who were laid off on August 6, 2013.  Exhibit 2 is Mr. Hepburn's prior declaration summarizing the events that preceded BB&T's account sweeps starting on August 1, 2013, and the subsequent actions of DSI's management team that were designed to save the company from a bankruptcy filing and liquidation.

Background of DSI's Relations With BB&T

Mr. Hepburn's declaration describes the relevant background concerning DSI's relationship with BB&T.  As recently as 2009, BB&T had extended $9.5 million to DSI in the form of a revolving credit line, and it previously had made an additional $9 million term loan to DSI.  Hepburn Dec. ¶ 3.  Throughout the period prior to 2010, DSI's primary relationship manager at BB&T, Richard Reid, caused Mr. Hepburn to believe that BB&T was interested in building a long-term relationship with DSI to promote its growth, consistent with the bank's decisions to extend significant financing to DSI, and to increase the levels of that funding over time.  *Id.*  Having encouraged DSI's growth using the bank's facilities, BB&T abruptly changed course the following year.

In 2010, Mr. Reid was sidelined and a new BB&T "work out" group from Atlanta took over DSI's loan accounts.  *Id.* ¶ 4.  This new group appeared intent on removing DSI's loans from the bank's balance sheets, including by imposing increasingly onerous financing terms, higher interest rates, and related requirements.  *Id.*  The BB&T official directly responsible for managing DSI's lending relationship with the bank starting in 2012 was Eric Hubbard.  Ex. 3 (Hubbard T.), at 13-15.

3

In August 2011, BB&T and DSI entered into the first of a series of nine forbearance agreements, which cumulatively extended the repayment term on a portion of DSI's indebtedness through the end of July 2013.   Hepburn Dec. ¶ 5.   Throughout the two-year forbearance period, DSI was never late in making a payment to BB&T, nor had DSI ever been late in making a loan payment over the course of its lending relationship with BB&T.  *Id.*

Early in 2013, BB&T officials entertained a plan to extend the forbearance period for another year.  *Id.* ¶ 6.  During these discussions, Mr. Hubbard's boss, Richard Spencer, told Mr. Hepburn that if DSI could obtain refinancing by the end of June, 2013 then everything would be fine, but that otherwise DSI needed a fallback plan.  Ex. 4 (Hepburn T.), at 174-75.  The fallback plan envisioned by Mr. Spencer involved accelerated repayment of the loans and would have necessitated some layoffs of DSI employees, while allowing DSI to continue its operations.  *Id.* Mr. Hepburn continued to regard an accelerated repayment plan as BB&T's fallback in the event DSI's refinancing could not be completed by mid-2013.  *See generally* Hepburn Dec. ¶ 6-7.

Potential MidCap Refinancing

In March 2013, Garrett Fletcher of MidCap Financial LLC ("MidCap") contacted DSI's outside accountant Joel Kay, based on a lead he had received from a former colleague.  Ex. 5 (Fletcher T.), at 8.  On March 26, 2013, MidCap issued DSI a term sheet for refinancing signed by Mr. Fletcher.  *Id.* at 8-9.  Mr. Fletcher learned of the *qui tam* action against DSI in late March. *Id.* at 9.  Mr. Fletcher explained that the existence of the *qui tam* action did not prevent MidCap's proposed refinancing, but affected how much MidCap was willing to advance.  *Id.* at 10.

MidCap commenced its due-diligence review of DSI at around the time that the term sheet was executed in late March, and its review continued into June.  *Id.* at 11-13.  DSI cooperated in the due-diligence process and paid MidCap a $15,000 non-refundable deposit for

4

its review.  *Id.* at 27-29.  In addition to this review, counsel for MidCap and DSI exchanged draft agreements to document the planned refinancing.[1]  *Id.* at 13.  On or around June 14, 2013, MidCap issued a commitment letter approving the transaction subject to final review by MidCap's credit committee, DSI's payment of additional fees at closing, and other general conditions.  *See* Ex. 6 (countersigned commitment letter, Fletcher Ex. 4), at 1, 3.

The prospects for a prompt and reasonable settlement of the *qui tam* action remained an overarching concern for MidCap.  Starting in March, Mr. Hepburn consistently expressed to MidCap that DSI should be able to settle the *qui tam* action for a payment of approximately $2 to $3 million.  *See* Fletcher T. 17.  Around June 18, 2013, Mr. Fletcher learned that DSI had offered the government $300,000 to settle the *qui tam* action.  *Id.* at 17-18.  Over the following week, MidCap discussed the *qui tam* negotiations with its own counsel, *id.* at 19, and with DSI's counsel involved in the DOJ settlement negotiations, *id.* at 83.  Based upon MidCap's concerns that the *qui tam* action could not be resolved at an amount that would allow the refinancing to proceed, Mr. Fletcher notified DSI on June 20, 2013 of his decision to rescind the commitment. *Id.* at 19-21, 42-47; *see also* Ex. 7 (Hubbard Ex. 22).[2]  In the same message, Mr. Fletcher clarified that MidCap remained interested in proceeding with the DSI refinancing if the *qui tam* action could be resolved on reasonable terms.  *Id.*; *see also* Fletcher T. at 22, 24-25.

---

[1] During discovery, DSI produced hundreds of pages of draft and redlined agreements that were exchanged between counsel for MidCap and DSI through June 17, 2013.  DSI was represented in these negotiations by Benjamin D. Horowicz of Miles & Stockbridge, and MidCap was represented by Daniel Flournoy of Waller Lansden Dortch & Davis based in Nashville, Tennessee.

[2] In his deposition, Mr. Fletcher acknowledged that his June 20 notice was erroneous in referring to DSI's non-payment of a commitment fee as a basis to withdraw the commitment, as this fee was not due until closing. Fletcher T. 39-40.  Mr. Fletcher's notice also cited the absence of an original signature of DSI on the commitment letter, although DSI had returned the countersigned commitment letter electronically (by email) on June 13, 2013.  *See* Ex. 6 (Fletcher Ex. 4).  In this light, it appears MidCap's concerns over the *qui tam* action were the only substantive impediment to the refinancing.

5

Accordingly, MidCap reached out to Mr. Hepburn four separate times between June 20 and July 19, 2013 to check on the status of the *qui tam* settlement negotiations. *See* Ex. 8 (Hepburn Exs. 19-22). Around July 19, 2013, MidCap's representatives had a further exchange with Mr. Hepburn, in which they advised him (orally and in writing) that MidCap would go forward with the refinancing as planned if the *qui tam* action could be settled for $2 to $3 million. Fletcher T. 23-24; *see also* Ex. 7 (Hubbard Ex. 22). At his deposition, Mr. Fletcher also confirmed that after June 20 MidCap remained willing to proceed with the refinancing in the event the *qui tam* action could settle in the vicinity of $2 to $3 million. Fletcher T. 48. Through these various communications, Mr. Hepburn understood MidCap to have added a condition requiring a settlement of the *qui tam* action. Hepburn T. 85-87.[3]

*Qui Tam* Settlement Negotiations

During the relevant time period in the Spring and Summer of 2013, DSI was represented in the *qui tam* action by Alston & Bird LLP, a prominent law firm with offices in the United States and Europe. Edward T. Kang was the Alston & Bird lawyer who directly engaged in settlement negotiations on DSI's behalf. *See generally* Ex. 9 (Kang Dec.).

Mr. Kang is a partner based in Alston & Bird's Washington, D.C. office. He is a 1998 graduate of Yale University and received his law degree from Harvard Law School in 2001. Kang Dec. ¶ 1. He specializes in representing clients in the healthcare industry, including parties defending actions filed under the False Claims Act. *Id.*

---

[3] Mr. Hepburn testified that either Mr. Fletcher or Michael Ciatto, a vice president at MidCap, had informed him during the Spring that a settlement of $3 to $4 million would be acceptable to MidCap. Hepburn T. 87-89, 178-79. Mr. Fletcher was not asked about this point in his deposition, and Mr. Ciatto was not deposed. For purposes of this motion, the difference is not material.

4427741.1

Alston & Bird represented DSI in the subject *qui tam* action, which is pending in the U.S. District Court for the Eastern District of Louisiana.  *Deane v. Dynasplint Systems, Inc.*, Case 2:10-cv-02085-KDE-JCW.  The relator, Meredith Monahan Deane, is a former DSI employee who challenged certain of its Medicare claim practices.  Kang Dec. ¶ 2.  The United States moved *ex parte* to intervene on August 15, 2012 (granted that day), and filed its Complaint in Intervention on December 14, 2012, at which time the case was unsealed.  *Id.*

DSI's settlement discussions with lawyers representing the government proceeded on an "ability to pay" basis.[4]  Mr. Kang's time records attached to his declaration reflect his ongoing communications during June and July, 2013 with the government lawyers concerning DSI's financial condition, which was an essential factor in evaluating an ability-to-pay settlement.  *Id.* ¶ 5.  Mr. Kang communicated DSI's opening offer of $300,000 to the government's lawyers on or around June 18, 2013.  *Id.* ¶ 6.  Mr. Kang had ongoing discussions with the DOJ's lawyers over the ensuing weeks concerning a settlement that would take due account of the company's distressed financial circumstances.  *Id.*  Around July 17, the government's lawyers and financial consultant requested an opportunity to speak with a MidCap representative.  *Id.* ¶ 7.  On July 19, Mr. Kang informed the DOJ's lawyers that MidCap had declined this invitation, but had confirmed its willingness to proceed with a refinancing of DSI if the *qui tam* action could be settled for $2 million or less.  *Id.* ¶ 7.

---

[4] According to the United States Attorneys' Manual, a United States Attorney should compromise or close a claim under various enumerated circumstances, including where "[t]he United States Attorney believes that the full amount of a claim of the United States cannot be collected in full due to the financial condition of the debtor."  *See* http://www.justice.gov/usao/eousa/foia_reading_room/usam/title4/3mciv.htm#4-3.200.

Mr. Kang continued thereafter to engage with the DOJ's lawyers concerning an ability-to-pay settlement. *Id.* ¶ 8. The government lawyers communicated a demand for $10 million: half payable by DSI immediately upon settlement, and the other half payable by Mr. Hepburn over a period of three to five years. *Id.* Continuing into the week of July 22, Mr. Kang's settlement discussions with the government lawyers centered on DSI's and Mr. Hepburn's limited financial resources and their inability to pay the amount demanded by the government. *Id.* Mr. Kang further focused on MidCap's stated willingness to complete the refinancing based upon a settlement in the range of $2 million. *Id.*

During Mr. Kang's final settlement discussion with the government's lawyers on July 25, 2013, the DOJ lawyers suggested that the government might reduce its aggregate demand to $7 million subject to approvals.[5] *Id.* ¶ 9. The settlement discussions ended shortly thereafter, and counsel for both sides turned their focus toward scheduling and discovery matters.[6] *Id.* ¶ 10.

Until the settlement talks ended on or around July 25, 2013, Mr. Kang regarded a settlement in the range of $2 million as achievable even though the government's demand for payment from both DSI and Mr. Hepburn had been much higher. *Id.* ¶ 11. Mr. Kang also believed that a settlement in this range was reasonable in view of DSI's and Mr. Hepburn's substantial defenses to the government's claims, and their demonstrated inability to pay a more significant settlement. *Id.*

---

[5] Although not explicit, presumably the government would have entertained a payment split similar to its previous demand, in which $3.5 million would become due at settlement with the balance payable over time by Mr. Hepburn personally and/or by the company. A payment of $3.5 million from DSI is near the range that Mr. Fletcher confirmed would have allowed MidCap to proceed with the refinancing. (DSI believed that the aggregate figure of $7 million was higher than the government's provable damages even if the *qui tam* case went to trial, and failed to account for its substantial defenses to liability.)

[6] Even after July 25, Mr. Hepburn continued to believe that a settlement of the *qui tam* action might be achievable if the government attorneys further reduced their demand to a reasonable level.

4427741.1

<u>Subsequent Actions by BB&T</u>

The extended forbearance period with BB&T was set to expire on July 31, 2013.  *See* Ex. 10 (Hubbard Ex. 20).  On Monday, July 29, Mr. Hepburn wrote to Mr. Hubbard at BB&T to inform him that with the *qui tam* litigation still pending, the MidCap refinancing would not close by July 31.  Ex. 11 (Hubbard Ex. 26).  Mr. Hepburn proposed a 12-month repayment plan similar to the plan the parties had discussed several months before, which would have required some layoffs of DSI staff implemented over a period of several weeks.  *See id.*  Mr. Hepburn asked for a response from Mr. Hubbard or the bank's counsel regarding this fallback proposal.  *Id.*

BB&T never responded.  Hepburn T. 160-61.  Mr. Hepburn has confirmed that at no time before August 1, 2013 did Dynasplint's senior management team contemplate that BB&T might begin "sweeping" all DSI funds in the company's operating accounts, or decide to dishonor the company's payroll checks and withholding tax payments to the IRS.  Hepburn Dec. ¶ 7.  Mr. Hepburn instead anticipated a further period of forbearance based on BB&T's pattern of having done so for two years, Hepburn T. 161, notwithstanding a steady drumbeat of bank warnings and demands for repayment throughout those years.[7]

---

[7] Mr. Hepburn has recounted becoming desensitized over two years in which he had numerous letters, emails and conversations in which the bank warned of the dire consequences of default.  Although DSI drastically paid down its debt over those two years from a high point exceeding $18 million to $11-plus million by late July, 2013, and was never late in making its scheduled loan payments, DSI was in default countless times throughout the forbearance period, and received a series of default notices from BB&T all reserving the bank's rights and remedies.  Moreover, DSI was out of compliance with innumerable reporting and other technical requirements imposed by the bank over those years.  Despite all nine prior occasions in which DSI approached or entered default, BB&T ultimately waived DSI's defaults and non-compliance, and chose to forebear every time—sometimes weeks after the expiration of a forbearance period and acceleration of the full debt.  During discovery in this matter, plaintiffs' counsel made no effort to explore the circumstances of the two-year forbearance period, neglecting to ask Mr. Hepburn any questions about the bank's two-year pattern of issuing various warnings, default notices, forbearances, and detailed technical requirements.

4427741.1

Indeed, Mr. Hepburn believed that BB&T had overreached and acted unlawfully in several respects by seizing the company's operating accounts and attempting to force it out of business, outside of any court-supervised proceedings for the protection of DSI's creditors and other key stakeholders, including its employees.[8] *E.g.,* Hepburn T. 172.

In the days immediately following August 1, 2013, Dynasplint's management team quickly concluded that the bank's sweeps of all operating funds would deprive Dynasplint of approximately 70% of its revenues. Hepburn Dec. ¶ 9. At that point, Mr. Hepburn concluded that the only action available that could save the company was a drastic reduction in Dynasplint's workforce. *Id.* ¶ 10.

Mr. Hepburn personally made this decision on Saturday, August 3. Hepburn T. 120. That same day, Mr. Hepburn left DSI's managers a detailed voicemail message describing the

---

[8] For example, in state court pleadings seeking to open BB&T's confessed judgments, DSI advanced a counterclaim for indemnification against BB&T asserting that the bank's control over DSI's operating accounts starting on August 1, coupled with its intimate knowledge of DSI's operations and funding needs, justified the conclusion that BB&T became a "responsible party" and violated federal tax law when it elected, without warning, to pay itself (and other hand-picked creditors), rather than honoring DSI's paychecks to employees and withholding tax payments to the IRS, thereby exposing DSI, its executives and corporate affiliates to demands for penalties and interest from the IRS. DSI advanced another counterclaim that BB&T had violated certain Medicare laws and regulations, and breached its own loan documents, by taking direct control of a DSI account into which Medicare receipts were deposited, rather than adhering to the so-called "double-lock box" arrangements required by law, which provides that a Medicare receivables account must be controlled *solely* by the named account holder rather than by a bank or intermediary. DSI raised additional counterclaims based upon BB&T's wrongful sweeps of DSI's funds and its dishonor of payroll and other checks designated for special purposes, including more than $60,000 in life insurance proceeds specially designated (with the bank's knowledge) as financial support for the minor children of one of DSI's former employees who had died. The Circuit Court for Anne Arundel County found that DSI had advanced substantial counterclaims, and therefore opened the confessed judgments to allow for full adjudication of the parties' claims and defenses. During these proceedings, although DSI generally had acknowledged a lender's right to take *orderly* steps to enforce loan agreements consistent with applicable law, it argued that BB&T crossed the line of lawful collection practices in various ways—none of which was foreseeable before August 1. For purposes of this action, it was hardly reasonable to anticipate that a lender might violate controlling law or applicable regulations as part of a single-minded enforcement campaign aimed at grabbing any and all operating funds for itself, and thereby seeking to destroy a viable business without any regard for the interests of its creditors, employees and many other stakeholders—including the IRS.

4427741.1

bank's actions and several potential responses. *Id.* at 98-110 (transcribing audio message). Mr. Hepburn's voicemail mentioned that: (i) over the course of three days, the bank had swept close to a million dollars from the company's accounts; (ii) BB&T had apparently run out of patience due to delays in the MidCap refinancing and the *qui tam* settlement process; (iii) Mr. Hepburn was entertaining two possible responses, one in which DSI's counsel might seek an emergency injunction to block the bank's enforcement actions,[9] entailing shorter-term layoffs of approximately 200 workers, and a second requiring a longer-term layoff of up to 500 people for three to five months; (iv) upon learning of the account sweeps, DSI had canceled a training program in Annapolis scheduled for the weekend of August 3 to 4;[10] and (v) although BB&T had previously been amenable to a 12-month repayment plan, it was now sweeping all DSI account funds without regard for the consequences. *Id.* Mr. Hepburn conducted a management meeting on Monday, August 5, in which the company's managers were instructed to identify roughly 180 people (in the aggregate) to retain, while all remaining workers would be laid off at least temporarily. Hepburn T. 119-20. The following day, Mr. Hepburn prepared the letter attached as Exhibit 1, which was distributed to employees who were laid off.

Mr. Hepburn has described his strong motivation to provide those employees with the best information available to him at the time, so that they could make appropriate plans.

---

[9] When DSI eventually was heard by the Circuit Court for Anne Arundel County, that Court stayed the bank's enforcement efforts pending a full disposition on the merits of DSI's counterclaims, which the Court found afforded a substantial and sufficient basis to open the bank's confessed judgments pursuant to Md. R. Civ. P. 2-611(d). However, by that date the bank already had swept millions of dollars from the company's accounts, forcing the layoffs and crippling its ability to operate at previous levels.

[10] This training program was set to take place over the weekend of August 3 and 4 for sales personnel from around the country. DSI canceled the training on Friday, August 2, after it became clear that BB&T was dishonoring DSI checks (including for payroll and withholding taxes). The scheduling of a company-wide training program for August 3 and 4 reinforces that DSI's management did not contemplate the necessity for large-scale layoffs before August 2013.

11

Hepburn Dec. ¶ 11.  In particular, Mr. Hepburn has stated, "In relating this difficult news, my highest priority was to be transparent and fair with our colleagues who were laid off.  It was especially important for me to level with people that we did not think everyone could be recalled."  *Id.* ¶ 13.  Accordingly, in his letter, Mr. Hepburn notified affected employees of the layoff; explained BB&T's abrupt action starting just a few days before to sweep the company's operating accounts rather than to fund payroll and other checks; outlined some of the background of DSI's dealings with BB&T, which culminated in the layoffs; and recounted his plans to recall some, albeit not all, workers as future circumstances would permit.  *See* Ex. 1.

Mr. Hepburn has summed up this difficult chapter with BB&T as follows:

> I never imagined that after two years of forbearance and our track record of making payments on time, BB&T would radically alter course on August 1, 2013 and seek to cut Dynasplint off from its base of operating revenues—the life blood of any business. Everyone at Dynasplint has suffered as a result of the bank's unconscionable efforts to drive a fundamentally sound business and longtime customer of the bank out of business.  It is difficult to convey the depth of my frustration for the havoc that the bank's actions needlessly have inflicted on so many innocent people in our company, including the two former colleagues who filed this lawsuit.

Hepburn Dec. ¶ 15.

4427741.1

# III. Argument

## A.   Summary Judgment Standards

The Court of Appeals for the Fourth Circuit recently reiterated the standards for deciding

a motion under Federal Rule of Civil Procedure 56:

> Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). Any party may seek summary judgment, regardless of whether he may ultimately bear the burden of proof under the relevant statutory scheme . . . . *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 521-22 (4th Cir. 2003). Irrespective of the burdens assigned by the applicable substantive law, Federal Rule of Civil Procedure 56 requires the movant to show that summary judgment is warranted. Fed. R. Civ. P. 56(a). We have observed that once the movant has satisfied this "initial burden" of demonstrating the absence of a genuine dispute as to any material fact, the nonmoving party must show that a genuine dispute does, in fact, exist. *Bouchat*, 346 F.3d at 522 (citing *Matsushita Elec. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)). A party raises a genuine issue of material fact with respect to a claim only if a reasonable jury could return a verdict for that party on each element necessary to that claim. *Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017, 1027 (4th Cir.1997).
>
> Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Stone v. Liberty Mut. Ins. Co.*, 105 F.3d 188, 191 (4th Cir.1997). Rather, "a party opposing a properly supported motion for summary judgment . . . must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat*, 346 F.3d at 522 (quoting Fed. R. Civ. P. 56(e) (2002) (amended 2010)). If the adverse party fails to provide evidence establishing that the factfinder could reasonably decide in his favor, then summary judgment shall be entered "regardless of '[a]ny proof or evidentiary requirements imposed by the substantive law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505).

4427741.1

*Dash v. Mayweather*, 731 F.3d 303, 310-11 (4th Cir. 2013).

As a corollary of these standards, summary judgment is appropriate where a defendant can establish the elements of an affirmative defense as a matter of law.  *See, e.g., Crockett v. Mission Hosp., Inc.*, 717 F.3d 348, 356 (4th Cir. 2013) (affirming summary judgment for employer in Title VII case); *Local Union 7107 v. Clinchfield Coal Co.*, 124 F.3d 639, 640 (4th Cir. 1997) (affirming summary judgment for employer in WARN Act case).

## B.   WARN Act Law and Precedents

The WARN Act requires employers to provide notification sixty calendar days in advance of plant closings and mass layoffs.  *See generally* 29 U.S.C. § 2102.  However, an employer may be excused from this 60-day notice requirement where a mass layoff was the result of business circumstances that were not reasonably foreseeable.  *Id.* § 2102(b)(2)(A).  In such circumstances, the employer is required to give "as much notice as is practicable," together with "a brief statement of the basis for reducing the notification period."  *Id.* at § 2102(b)(3).

Several authorities provide guidance for interpreting the Act's "not reasonably foreseeable" language.  Regulations promulgated by the Department of Labor recognize that circumstances are not reasonably foreseeable when "caused by some sudden, dramatic, and unexpected action or condition outside the employer's control."  20 C.F.R. § 639.9(b)(1).  For example, the regulations recognize that a large client's "sudden and unexpected termination of a major contract" would be considered not reasonably foreseeable.  *Id.* § 639.9(b)(1).

Furthermore, the Court of Appeals has cautioned that in this analysis, courts "must be careful to avoid analysis by hindsight," as "the trail of harbingers of an unforeseen event always looks brighter in retrospect."  *Clinchfield Coal*, 124 F.3d at 641 (quoting *Loehrer v. McDonnell*

*Douglas Corp.*, 98 F.3d 1056, 1061 (8th Cir. 1996)).   Recognizing that "even the most conscientious employers are not perfect," the act and regulations "allow needed flexibility for predictions about ultimate consequences that, though objectively reasonable, proved wrong." *Id.* In *Clinchfield Coal*, the Court of Appeals affirmed summary judgment for the employer where a contract renewal had been expected, based in part on a history of prior dealings, but the parties never reached final terms.

Accordingly, courts have recognized that "it is the *probability* of occurrence that makes a business circumstance reasonably foreseeable, rather than the mere *possibility* of such a circumstance." *Roquet v. Arthur Andersen LLP*, 398 F.3d 585, 589 (7th Cir. 2005) (emphasis added); *accord In re Jevic Holding Corp.*, 496 B.R. 151, 160-61 (Bankr. D. Del. 2013) (citing additional precedents).   The triggering event does not need to strike from "out of the blue" for the defense to prevail.  *Rocquet*, 395 F.3d at 590.  In this case, the question is whether DSI's management should have reasonably anticipated that BB&T would abruptly seek to force DSI out of business starting on August 1, 2013 through a combination of operating account sweeps and related enforcement measures, rather than engaging in a plan of accelerated repayment, continued forbearance, and/or judicial enforcement.  BB&T's actions here, after a lengthy period of debt paydown and forbearance did strike DSI from "out of the blue," as Mr. Hepburn stated in his declaration.  Hepburn Dec. ¶ 15.

Applying these principles, numerous federal courts have ruled for employers based upon the unforeseeability defense in circumstances comparable to this case.  *E.g., Clinchfield Coal*, *supra*, 124 F.3d 639 (affirming employer summary judgment); *see also Gross v. Hale-Halsell Co.*, 554 F.3d 870 (10th Cir. 2009) (affirming summary judgment where termination of key supply relationship was not reasonably foreseeable); *Hotel Employees & Rest. Employees Int'l*

*Union Local 54 v. Elsinore Shore Assocs.,* 173 F.3d 175, 175 (3d Cir. 1999) (same where state commission's order closing a casino, although a possibility, was not reasonably foreseeable); *Halkias v. General Dynamics Corp.*, 137 F.3d 333 (5th Cir. 1998) (holding that government contract cancellation was not foreseeable probability at the time when notice would have been required, given officials' prior expressions of support for program); *Loehrer*, 98 F.3d 1056 (similar); *In re FF Acquisition Corp.*, 438 B.R. 886, 893 (Bankr. N.D. Miss. 2010) (finding that a lender's reduction of an advance rate for borrowing without warning, followed by the complete termination of financing, was not reasonably foreseeable, and that the "abrupt unavailability of operating funds caused the layoffs"), *order aff'd, appeal dismissed sub nom., Angles v. Flexible Flyer Liquidating Trust*, 471 B.R. 182 (N.D. Miss. 2012), *aff'd sub nom., In re Flexible Flyer Liquidating Trust*, 511 F. App'x 369 (5th Cir. 2013); *Bradley v. Sequoyah Fuels Corp.*, 847 F. Supp. 863 (E.D. Okla. 1994) (finding that plant closing caused by unexpected release of nitrogen dioxide was not reasonably foreseeable); *Chestnut v. Stone Forest Industries, Inc.*, 817 F. Supp. 932 (N.D. Fla. 1993) (finding drastic drop in prices for company's product was not reasonably foreseeable); *Jones v. Kayser-Roth Hosiery, Inc.*, 748 F. Supp. 1276 (E.D. Tenn. 1990) (finding major customer's abrupt account closing was not reasonably foreseeable).[11]

---

[11] DSI's circumstances in early August, 2013 are comparable to those described in the bankruptcy court's first opinion from 2010 in *FF Acquisition*: "Michael Earrey indicated that while some of these events did occur, he worked tirelessly to overcome them. Considering the effectiveness of Earrey's remedial proposals as they actually unfolded, Earrey's exercise of his business judgment, in keeping Flexible Flyer going and in anticipating that Flexible Flyer would continue operations into 2006, was completely reasonable." *Id.* at 893; *see also id.* at 895-96 (recognizing that Earrey never contemplated a mass layoff around the time plaintiffs contended that notice should have issued). Another case presenting a relevant contrast is *Childress v. Darby Lumber, Inc.*, 357 F.3d 1000 (9th Cir. 2004), in which the court recognized that a business's closure was caused by economic factors that accumulated over time, including a generally depressed market and increased material costs. *See also United Paperworkers Intern. Union, AFL-CIO, CLC v. Alden Corrugated Container Corp.*, 901 F. Supp. 426, 435-36 (D. Mass 1995) ("[F]rom 1988, Bates was experiencing a financial decline. The expansion of the manufacturing capacity

Among these, a recent precedent of the Delaware bankruptcy court affords an especially useful comparison to this case. *See In re Jevic Holding Corp.*, 496 B.R. 151 (Bankr. D. Del. 2013). In *Jevic*, former employees of a Chapter 11 debtor brought an adversary proceeding alleging federal and state WARN Act violations. The debtors raised the unforeseeability defense based upon a key lender's termination of credit, which led to a "prompt collapse" of the business. *Id.* at 161. In accepting the defense, the court found that while termination had been a possibility, it was not *probable* at the time when the WARN Act notice would have been required, in view of the lender's previous allowance of multiple forbearances while the debtor explored options to reorganize and/or raise capital.[12] *See id.* at 162-64.

The court further recognized the debtors' actions as "indicative of a company attempting to stave off layoffs, and attempting to save jobs and the company," so that it would "run counter

---

at Bates in May, 1990 has been described as 'an operational disaster' from the beginning. Following the reorganization, 'business levels dropped significantly each month' at Bates while 'monthly losses continued to mount.'"). Here, by contrast, DSI remained a viable company in a vibrant market sector even at the time BB&T declared it in default and began its campaign to force the company into liquidation. *See generally* Hepburn Dec. ¶ 5.

[12] *Jevic* cites the following supporting precedents: "*In re Advanced Accessory Sys., LLC*, 443 B.R. 756, 765 (Bankr. E.D. Mich. 2011) ('The Court finds that Defendant's actions in January and early February 2009 were consistent with those of similarly situated employers and were commercially reasonable attempts to keep the business afloat long enough to sell . . . .'); *Roquet v. Arthur Andersen LLP*, 398 F.3d 585, 588 (7th Cir. 2005) ('We believe that a reasonable company in Andersen's position would have reacted as it did. Confronted with the possibility of an indictment that threatened its very survival, the firm continued to negotiate with the government until the very end and turned to layoffs only after the indictment became public.'); *Loehrer v. McDonnell Douglas Corp.*, 98 F.3d 1056, 1062 (8th Cir. 1996) ('Furthermore, while McDonnell Douglas admittedly was aware of the Government's dissatisfaction with the co-contractors' performance, that knowledge alone cannot in this case suffice to prevent the operation of the exception for unforeseeable business circumstances.'); *Gross v. Hale–Halsell Co.*, 554 F.3d 870, 877 (10th Cir. 2009) ('While the situation leading up to United's eventual termination of the primary supplier relationship 'would undoubtedly raise the eyebrows of any prudent businessperson,' the evidence does not suggest that United's decision was reasonably foreseeable prior to HHC's receipt of the January 15 letter.') (quoting *Loehrer*, 98 F.3d at 1062); *In re Flexible Flyer Liquidating Trust*, [No. 12-60242, 2013 WL 586823, at *3 (5th Cir. Feb. 11, 2013) (unpublished opinion)] ('All of the evidence proffered thus shows that the focus of Flexible Flyer's management was on saving the company, not planning for an upcoming shutdown . . . .')."

4427741.1

to the WARN Act's policy of encouraging employers to take all reasonable actions to preserve the company and the jobs to impose liability upon the Debtors for not giving notice sooner than they did." *Id.* at 163. As set out below, this case raises an even stronger unforeseeability defense than in *Jevic*.

**C.    DSI Gave Its Employees Notice as Soon as Reasonably Practicable Under the Rapidly Evolving Circumstances it Faced.**

By August 1, 2013, BB&T had granted DSI nine forbearances over the course of two years (some well after expiration of the forbearance period), and its officials had indicated receptiveness to extend the forbearance period for another year subject to reaching final terms, as DSI continued to pay down its liabilities to BB&T and explored refinancing options. Hepburn Dec. ¶¶ 5, 6. Throughout the forbearance period, DSI stayed current on its loan payments to BB&T, continued exploring the MidCap refinancing and settlement of the *qui tam* action, attempted to negotiate the terms of an extended repayment plan with BB&T, and remained a viable business even through the time when BB&T declared a default and started its extraordinary collection and enforcement measures. *Id.* ¶ 5. It is beyond dispute that DSI pursued the MidCap refinancing actively, including by cooperating in the due-diligence review, paying a substantial non-refundable deposit, and engaging counsel who negotiated draft transaction papers with counsel for MidCap. *See* Fletcher T. 13, 27-29. It is further undisputed that through late July, DSI through its attorney Mr. Kang sought a reasonable and prompt settlement of the *qui tam* action—the only material impediment to the MidCap refinancing. *See generally* Kang Dec. ¶¶ 7-9.

18

That BB&T might seek to cut off DSI from all sources of operating revenues and force a viable company into liquidation was never within the contemplation of DSI's management prior to August 1, 2013. *See* Hepburn Dec. ¶¶ 6-7. The account sweeps that began that day came as a shock to DSI's management, which had every expectation of continuing operations while making increased loan payments and working out its liability to BB&T. *Id.*

The factual circumstances that were the focus of this Court's earlier opinion complete the picture and provide further support for DSI's position. The discovery record establishes that MidCap remained willing to proceed with the refinancing if the *qui tam* action could be settled for around $2 to $3 million. Fletcher T. 22-24, 48. The settlement discussions between Mr. Kang and the DOJ's lawyers continued through July 25, 2013, and throughout these negotiations Mr. Kang believed that a settlement of approximately $2 million was both achievable and reasonable, in view of DSI's substantial defenses and uncertainties in the government's case. *See* Kang Dec. ¶¶ 9, 10. Mr. Kang is an experienced lawyer with expertise in defending *qui tam* actions. His firm represented DSI in the *Deane* action throughout the relevant period, and he directly participated in the settlement discussions with the DOJ's lawyers. As such, Mr. Kang's assessment of the reasonable prospects of settlement, based on his personal knowledge of the case and the DOJ negotiations, is highly relevant. Moreover, the DOJ lawyers' late July settlement demand for $7 million likely assumed the same split as their earlier demand—*i.e.,* an upfront payment of $3.5 million at settlement, with the balance payable over three to five years by Mr. Hepburn individually and/or by the company—meaning an upfront payment near the $2 to $3 million range specified by Mr. Fletcher. Under these circumstances, plaintiffs cannot prove that a settlement was beyond reach prior to the time negotiations broke off on July 25. DSI reasonably pursued negotiations to settle the *qui tam* action. If a settlement had been

4427741.1

achieved around the range specified by MidCap, then Mr. Fletcher confirmed that MidCap would have completed the refinancing, thereby averting the need for layoffs.  Under all of the circumstances presented to DSI's management, a premature mass-layoff notice would have sounded the death knell for the company.

As the Court of Appeals cautioned in *Clinchfield Coal*, it is essential to avoid viewing such matters with the perfect clarity of hindsight—*e.g.*, simply because a *qui tam* settlement did not happen means that *it could not happen* in a reasonable time or amount.  This Court also should resist the view that some form of WARN Act notice was required as early as June—even as DSI remained actively engaged into late July in efforts to resolve the *qui tam* action that, had they borne fruit, could have averted layoffs altogether.  This is all the more true for liabilities that had already matured and been extended *nine times* without bank enforcement, and that were steadily being paid down by a solvent company in the normal course of business.  To entertain a June notice date would set a legal standard that invites far more harm than good.  Considering this case as an example, DSI is a company that strived mightily—ultimately with success[13]—to work out its liability to BB&T while remaining in business.  A WARN Act standard requiring DSI to have given its entire workforce a layoff notice prematurely or prophylactically—based upon a hypothetical possibility of mass layoffs that were neither certain nor planned—is decidedly *__not__* what the law requires.  *See, e.g., Roquet,* 398 F.3d at 589 ("In determining whether

---

[13] DSI completed refinancing through a different third-party lender just months after BB&T began its enforcement campaign, thereby allowing DSI to repay BB&T in full in February, 2014.  Although the terms of the completed third-party refinancing were less favorable than the proposed MidCap financing, it bears noting that DSI was able to secure significant funds from a commercial lender at a time when the *qui tam* action remained pending, and Medicare had frozen (starting in August, 2013) millions of dollars of DSI funds pending a disposition of the *qui tam* action.  The *Deane* action remains pending at this time, and the parties have briefed motions for partial summary judgment.  DSI remains confident that the government's case lacks legal and factual merit in various respects.

a crippling business circumstance is foreseeable, we must bear in mind that 'it is the probability of occurrence that makes a business circumstance reasonably foreseeable, rather than the mere possibility of such a circumstance.'").  Moreover, such a notice would have sent shock waves rippling across DSI's business, and invariably been interpreted by key stakeholders and the market as the "white flag" of surrender.  Such an action may well have become a self-fulfilling prophecy as third-party insurers and health providers withdrew their business from DSI, employees quit, and potential lenders or other investors recoiled from any prospect of alternative financing.

Citing similar concerns, the Court of Appeals for the Third Circuit rejected a standard that "might require an employer to provide more frequent WARN notice," as this could "require an economically viable employer to provide notice of a possible—but unlikely—closing." *Elsinore Shore Assocs.*, 173 F.3d at 185 n.7.  The Court of Appeals recognized that such notice—by engendering an overreaction among employees, creditors and in the market—may by itself "increase the chance that an employer will be forced to close and lay off its employees, harming precisely those persons WARN attempts to protect." *Id.*

The reality of what happened in this case, while causing significant hardships for all DSI employees and former employees, is decidedly better when looking through the lens of the WARN Act's object and purpose.  Rather than a defunct business with no employees, DSI issued a WARN Act notice almost immediately after obtaining concrete information that it could report concerning BB&T's collection campaign.  The path taken by DSI allowed affected employees to plan better than if they had simply received a notice that the company saw approaching storm clouds that might or might not necessitate any layoffs.  It also allowed DSI to issue the August 6 notice only to the affected individuals, while retaining nearly 200 other employees deemed

21

essential to the company's survival—many of whom might have left on their own had they received a premature notice signaling that the entire company may fail.

Based on its reasonable and appropriate actions, DSI weathered the worst of the financial storm brought on by BB&T and has managed to recall dozens of those who were laid off.  This should not be viewed as a WARN Act liability, but rather as a WARN Act success story.

**D.**     **It Was Impracticable for DSI To Issue a WARN Act Notice Before It Knew How BB&T Would React Upon Expiration of the Ninth Forbearance Period.**

Even setting aside the intricacies of DSI's *qui tam* negotiations or its dealings with MidCap, the question remains what notice might DSI have provided before BB&T actually commenced its draconian enforcement and collection campaign in early August, 2013.

DSI had already gone into default and obtained forbearances from BB&T on nine separate occasions.  Senior bank officials advised Mr. Hepburn in early 2013 that if a debt refinancing could not be accomplished by mid-year, then the parties should entertain an aggressive repayment plan, which Mr. Hepburn believed could necessitate around 200 layoffs.[14] Mr. Hepburn continued to regard this as the bank's fallback position.  He has testified without contradiction that prior to August, 2013, DSI did not entertain the possibility that BB&T might exercise a "nuclear option"—a liquidation strategy comprising 100% account sweeps, attempted appointment of a financial receiver, confessed judgment proceedings and garnishment writs issued to third-party institutions, and related enforcement activities.  Mr. Hepburn wrote to Mr. Hubbard when it became clear that the *qui tam* action could not be settled, in order to reprise the bank's earlier idea of an accelerated one-year repayment plan.  Ex. 11.  BB&T did not respond

---

[14] *See* Hepburn T. 104.  Spread across the company's workforce nationwide, temporary layoffs of this magnitude may not have triggered any WARN Act notice at all.  *See generally* Doc. 48 (DSI Opp. to Class Cert.), at 12-24 (discussing the statutory "single site" requirements in detail).

4427741.1

and instead laid the groundwork for its massive enforcement campaign aimed at destroying DSI's business practically overnight, before an organized opposition could be mounted by the company and its lawyers.[15]

Any suggestion that BB&T disclosed its intention to force DSI into liquidation before early August is spurious. To the contrary, Mr. Hubbard testified that BB&T did **_not_** warn DSI of any account sweeps, Hubbard T. 91-92, and plaintiffs' lead counsel candidly volunteered earlier in these proceedings that a lender naturally would conceal such intentions in order to mitigate the risk that a debtor might divert funds or assets, *see* Doc. 20-1 (Olsen Dec.), ¶ 9. The far thinner gruel plaintiffs have offered up recently consists of two letters from June, 2013, in which Mr. Hubbard inserted legal language reserving the bank's rights and remedies under the original lending documents. However, these letters lack the talismanic significance attached to them by plaintiffs' counsel. From Mr. Hepburn's perspective, the bank had been warning him incessantly over two years about its vast arsenal of rights and remedies. BB&T routinely reserved all of its rights and remedies. Mr. Hepburn's focus was on what the bank's officials, including Mr. Spencer, personally told him about its preferred fallback position involving accelerated repayment of the debt.

Moreover, it cannot be deemed "reasonable" to suggest that a lender in BB&T's position might reach so far into its enforcement arsenal as to risk violating federal law or regulations, or other standards for sound commercial lending, by seizing effective control of its debtor's base of

---

[15] By serendipity, the circumstance that chiefly thwarted the bank's campaign was that, for technical and administrative reasons, some of DSI's legacy payors had continued sending physical checks directly to the company rather than initiating electronic funds transfers to DSI's accounts administered by BB&T. DSI relied on this minimal infusion of funds, and limited funds from other sources, to maintain scaled-down operations until the Circuit Court for Anne Arundel County ultimately stayed the bank's enforcement activities, and DSI was able shortly thereafter to secure alternative refinancing that allowed it to settle the outstanding BB&T debt in February, 2014, and to save hundreds of jobs.

operating funds without regard for how such destructive actions might impair the interests of other creditors or stakeholders, including employees as well as the IRS.  DSI was not alone in regarding the bank's unrestrained campaign as legally suspect: The Circuit Court for Anne Arundel County found that DSI's counterclaims against BB&T provided a substantial and sufficient basis to open the confessed judgments procured by the bank, and unwound several of the bank's overreaching attempts to force DSI into liquidation.[16]

In short, even supposing that BB&T might have been expected to take a more aggressive posture upon expiration of the ninth forbearance period (such as an accelerated repayment plan), DSI's management could still only speculate as to what specific action the bank might take, and how such action might impact DSI's business and workforce.  DSI was decidedly __*not*__ in a position before the first week of August to determine whether or not any statutory layoff notice might be required.  To have issued a premature warning before August 1 would have required guesswork about the nature and scope of the bank's possible responses, and provided employees little if any useful information beyond the already common knowledge that the company was having protracted difficulties with its principal lender, BB&T.  Indeed, had BB&T chosen almost every other course open to it, DSI's issuance of a prophylactic WARN Act notice might have proved unnecessary, or worse yet created its own material business risks for the company.[17]

---

[16] Among these, the Circuit Court: quashed garnishment writs earlier issued at BB&T's request to multiple third-party institutions; rejected the bank's demand for appointment of a receiver; stayed the bank's enforcement campaign against DSI pending final disposition of the parties' claims and defenses; and deferred related foreclosure proceedings.  DSI settled with the bank just two months after the Circuit Court granted DSI these forms of desperately needed relief.  *See also* n.8.

[17] Setting the notice standard too low has far-reaching implications that the Court should weigh carefully.  For instance, entertaining such an approach begs the question:  Should DSI have issued a WARN Act notice about possible layoffs *each of the prior nine times* it approached or entered default under its loan agreements with BB&T?  If it had, then DSI's business might have foundered two years sooner, depriving

BB&T stepped into an instrumental role when it seized the company's operating accounts starting on August 1, 2013, and decided which creditors to pay and which not to pay. By August 3 it was clear that BB&T had exercised the nuclear option by seizing DSI's accounts and paying only itself and several other hand-picked creditors (while excluding DSI's employees and the IRS among many others). From that date forward, the bank's actions determined the scope and magnitude of layoffs that were necessary, and the undisputed facts show that BB&T did not reveal its particular enforcement plans to DSI prior to August, 2013.

Stated differently, DSI submits that to overcome summary judgment, plaintiffs would have needed evidence that BB&T's _likely_ reaction was to seek the forced liquidation of DSI by every legal and extralegal means, as opposed to countless more prudent responses—such as: seeking to enforce the bank's confessed judgments through orderly judicial proceedings that could have protected DSI as well as other creditors and stakeholders from abuse; imposing an accelerated repayment plan along the lines suggested by Mr. Spencer, thereby necessitating far fewer temporary layoffs; or other similar means focused on repayment of the debt. DSI does not believe plaintiffs can sustain their burden by pointing to boilerplate language reciting the bank's rights and remedies, as these were simply a menu of _possible_ actions the bank might take—just as those remedies were available to BB&T _on any of the prior nine occasions when it instead chose to forbear_. Nor would it suffice to show that the bank might initiate legal enforcement, without seizing DSI's accounts and dishonoring DSI's checks for payroll, withholding taxes, and other critical priorities. Such proceedings would have afforded DSI the benefits of judicial oversight and due process, the vital time to continue pursuing refinancing opportunities

---

its entire workforce (including plaintiffs) of two years of wages and benefits during which DSI actually remained in business.

4427741.1

elsewhere, and the manageable costs involved in litigating against the bank.[18]

Plaintiffs have generated no evidence in discovery to suggest that a strategy of forced liquidation and extreme self-help measures was BB&T's probable reaction prior to August 1, 2013.  Nor can plaintiffs show that anyone at DSI was aware that the bank might attempt a forced liquidation of its long-time customer, or counter Mr. Hepburn's sworn affidavit that BB&T's liquidation strategy caught the company's managers by surprise.

**E.** **DSI Served Its Notice Within a Reasonable Time After Learning That the *Qui Tam* Action Could Not Settle.**

Even if the Court finds that DSI might have issued some form of WARN Act notice to all its employees after it became clear that the *qui tam* action could not settle in late July, then under a consistent line of circuit precedents the Court nevertheless should enter summary judgment in DSI's favor.

In at least five WARN Act precedents, federal courts of appeals have consistently recognized that an employer needs reasonable time—*e.g.,* a week to ten days—after learning of the necessity of layoffs to plan and consult with advisors prior to actually serving a statutory notice.[19]  Here, the earliest DSI could have recognized an imminent possibility of ordering some

---

[18] It took several months to obtain interim rulings from the Circuit Court for Anne Arundel County, at which point discovery on the parties' claims and defenses commenced.  The case settled shortly thereafter, in February, 2014—when DSI completed its third-party refinancing.

[19] *E.g., U.S. Steel Workers of Am. Local 2660 v. U.S. Steel Corp.*, 683 F.3d 882, 889 (8th Cir. 2012) ("We have deemed notice sufficient when—after the causal event giving rise to the layoff becomes known—the employer takes approximately one week to discuss the unforeseen circumstances with business advisors and determine how to respond before giving notice."); *Gross v. Hale-Halsell Co.*, 554 F.3d 870, 878 (10th Cir. 2009) ("We do not think HHC violated the WARN Act's notice requirements, nor did it act unreasonably, in taking just three business days [and seven total days after layoffs became foreseeable] to determine whether 'it could survive the carnage.'"); *Roquet v. Arthur Andersen LLP*, 398 F.3d 585, 590 (7th Cir. 2005) (recognizing that defendant, when "faced with [an] unprecedented cataclysmic event, reasonably needed a little time to assess how things would shake out" before delivering WARN Act notice); *Halkias v. Gen. Dynamics Corp.*, 137 F.3d 333, 336-37 (5th Cir. 1998) (accepting that

4427741.1

layoffs—*albeit still of unknown magnitude or duration*—was when the *qui tam* settlement negotiations ended on July 25, 2013.[20]   From that point forward, DSI acted with reasonable dispatch.

The following Monday, July 29, Mr. Hepburn wrote to Mr. Hubbard in an effort to revive the bank's previously suggested accelerated repayment plan, which would have necessitated far fewer layoffs than what actually transpired. *See* Ex. 11 (Hubbard Ex. 26).  Having received no response from Mr. Hubbard, DSI personnel began to notice aberrant bank account activity by Friday, August 2.  By Saturday, it became clear to Mr. Hepburn that the bank had ceased payment of all DSI checks.  That evening, Mr. Hepburn notified managers of the circumstances as he understood them, as well as potential responses the company might take.  He convened a managers meeting on Monday evening, in which he directed managers to identify workers deemed essential for the company to survive.  The WARN Act notice issued the following day, Tuesday, August 6.  Therefore, DSI issued its notice eight business days following the breakdown of settlement negotiations with the DOJ, and just two business days after it became apparent that BB&T had begun to seize operating funds held in the company's accounts.  Mr. Hepburn and his managers remained active throughout this brief time in seeking to avert larger-scale layoffs, and in planning and implementing a layoff once the drastic scope of BB&T's

---

employer's notice one week after learning of the probability of layoffs—from Dec. 14 to 21, 1990—was as much notice as practicable under the circumstances); *Loehrer v. McDonnell Douglas Corp.*, 98 F.3d 1056, 1062 (8th Cir. 1996) (holding eight days' notice sufficient).   Indeed, the 60-day notice period may be reduced *or even eliminated* depending upon the circumstances. *See* 20 C.F.R. § 639.9 (recognizing requirement of as much notice as practicable "may, in some circumstances, be notice after the fact").  We are unaware of any court expressing disagreement with this line of applicable caselaw.

[20] July 25 is the earliest date that DSI could have anticipated an imminent need to order some layoffs. However, as reviewed in the preceding section, the far more realistic date when DSI was actually in a position to provide meaningful notice to specific employees was August 6, just a few days after DSI learned the nature and extent of the bank's response and developed a plan in response.

actions first became clear by August 3.

DSI respectfully submits that a period of days under the extraordinary circumstances that DSI faced is both reasonable and prompt, and falls well within the time period recognized by circuit precedents.  Even assuming that DSI could have recognized a likely need for layoffs (at some unknown level) as of July 25, 2013, this Court should conclude that the company still provided notice as soon as it was practicable to do so, based on the consistent line of circuit precedents reviewed above.

## IV.  Conclusion

For the foregoing reasons, this Court should grant DSI's motion and enter summary judgment in its favor on plaintiffs' sole claim under the WARN Act.  This action should be dismissed with prejudice.

Date:   January 7, 2015                     Respectfully submitted,

_____*/s/ William J. Murphy*_____

William J. Murphy (Bar No. 00497)
Robert T. Shaffer III (Bar No. 04074)
Daniel P. Moylan (Bar No. 26476)
ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Suite 2440
Baltimore, MD 21202-1031
T: 410-332-0444
F: 410-659-0436
wmurphy@zuckerman.com
rshaffer@zuckerman.com
dmoylan@zuckerman.com

*Counsel for Defendant*