```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF MARYLAND

 3                      NORTHERN DIVISION

 4        ----------------------------X

 5     DANA LYNN RIDGE, et al.,        )

 6                   Plaintiffs    )

 7            V                    )  Case No.

 8     DYNASPLINT SYSTEMS, INC.,    )  1:14-CV-00378 GLR

 9                   Defendants    )

10        ----------------------------X

11

12              Deposition of GEORGE HEPBURN

13                   Baltimore, Maryland

14              Tuesday, November 18, 2014

15                      9:12 a.m.

16

17

18

19

20

21

22

23     Job No.: 69728

24     Pages: 1 - 187

25     Reported by:  Dianna C. Kilgalen, RPR.
```

1   signature on it?

2       A.    I don't recall that they did that.

3       Q.    At any time, did MidCap withdraw its

4   commitment?

5           MR. SHAFFER:  Objection to the word

6   withdraw.  You can answer.  You can answer,

7   Mr. Hepburn.

8       A.    Okay.  I don't believe they ever really

9   totally withdrew it ever.

10  BY MR. TUFTS:

11      Q.    Did they ever indicate to you they were

12  withdrawing the commitment?

13      A.    They made a conditional -- they added a

14  condition to moving forward.

15      Q.    But they never said to you:  We are

16  withdrawing our commitment?

17          MR. SHAFFER:  Did they ever use that

18  word?

19      A.    They did and they didn't.  I don't

20  remember.  I mean, it was kind of vague, because

21  they came right back and said they would continue

22  onward if I could just get one thing done.

23          (Whereupon, Hepburn Deposition Exhibit 6

24  was marked for identification.)

25          MR. TUFTS:  What has been marked as

1    Exhibit 6 is a one-page document stamped D 1144,

2    and e-mail chain dated June 19th, 2013, from you to

3    Michael Ciatto with a copy to Bonnie Maisel.

4        A.    Bonnie Maisel.

5    BY MR. TUFTS:

6        Q.    Maisel.  Do you recognize this document?

7        A.    Sure.

8        Q.    Did you send it?

9        A.    Most likely.

10            MR. TUFTS:  After you have read it,

11   please let me know when you have finished.

12            THE WITNESS:  Okay.  I have read it.

13       Q.    Directing your attention to the first

14   paragraph, it says:  Thanks for the heads-up

15   yesterday.  Do you see that?

16       A.    Yes.

17       Q.    What are you referring to there?

18       A.    I don't recall.

19       Q.    Do you recall having a conversation with

20   Mr. Ciatto on June 18th?

21       A.    No.

22       Q.    Do you recall Mr. Ciatto ever

23   communicating to you a decision on moving forward

24   that you reference in the last sentence of that

25   first paragraph?

1        A.      Could you repeat the question?

2        Q.      Do you recall Mr. Ciatto communicating to

3    you a decision on moving forward as referenced in

4    the last sentence of the first paragraph?

5        A.      Yeah.   I thought they were moving forward

6    at this point.

7        Q.      Okay.   Well, what I'm asking about is had

8    Mr. Ciatto communicated to you a decision on moving

9    forward prior to this e-mail?

10       A.      A conditional decision, yes.

11       Q.      What was that conditional decision?

12       A.      I believe that we get a settlement offer

13   from the DOJ.

14       Q.      Did he tell you what -- did he express a

15   dollar value that would be acceptable?

16       A.      I believe he did.

17       Q.      What was that dollar value?

18       A.      He had a dollar value of about three to

19   four million.

20       Q.      He said if DSI could settle the DOJ

21   lawsuit or the qui tam action for -- I'm sorry --

22   did you say three to four million?

23       A.      Three to four million.

24       Q.      -- three to four million, then MidCap

25   could move forward on the refinancing deal?

1    A.    Yes.  It was either he or Garrett

2  Fletcher.

3    Q.    That was prior to June 19th, 2013?

4    A.    Yes.

5    Q.    Do you know approximately when?

6    A.    I think it was April or May that they

7  said that.  It would have been mainly Garrett

8  Fletcher at that point.

9    Q.    But you don't recall Mr. Ciatto

10  communicating to you a decision on moving forward

11  on June 18th specifically?

12    A.    A decision?  What do you mean?

13    Q.    It's in your e-mail, a decision on moving

14  forward that you reference in that last sentence.

15  Do you see it?  It says:  Frankly I believe it may

16  influence our decision on moving forward.

17    A.    Right.  I don't know what that means.

18    Q.    The reason I'm asking is because you

19  referenced an April discussion with Mr. Fletcher --

20    A.    Right.

21    Q.    -- in which he said if it settled, the

22  qui tam lawsuit, for three to four million, then

23  MidCap could move forward with the refinancing.

24    A.    Right.  Right.

25    Q.    And I guess what I'm asking about is any

1    decision between the time of that communication

2    with Mr. Fletcher and this e-mail.

3        A.    They wanted to have the lawsuit settled.

4        Q.    Did you communicate the dollar figure

5    that they would deem acceptable for a settlement to

6    BB&T?

7        A.    No.  I don't think so.

8        Q.    Why not?

9        A.    Why would I involve them in the lawsuit?

10       Q.    I'm just asking if you were advising them

11   of the status of the settlement negotiations.

12           MR. SHAFFER:  Well, at what point in time

13   are you -- your question --

14           MR. TUFTS:  You are right.  Let's start

15   with the first -- let's start back in April, when

16   Mr. Fletcher informed you that the qui tam action

17   would have to be settled for three to four million

18   in order for them to move forward with the

19   refinancing deal.

20           THE WITNESS:  Right.

21   BY MR. TUFTS:

22       Q.    At that time or any time thereafter, did

23   you convey that communication to BB&T?

24       A.    I don't recall.

25       Q.    Was DSI under an obligation to

1   communicate to BB&T the status of the qui tam

2   lawsuit?

3        A.    I believe I was.

4        Q.    You referred to it as a conditional

5   decision.  MidCap would only move forward with the

6   refinancing if the qui tam action could be settled

7   for three to four million dollars, correct?

8              MR. SHAFFER:  Objection to the form of

9   the question.  I think your question is a little

10  bit ambiguous.  Because if you are referring to the

11  April conversation, that would have been prior to

12  the issuance of a formal commitment letter.

13             So your question implies that there was

14  some condition prior to the issuance of the

15  commitment letter that somehow attached to the

16  commitment itself, and I think that's not the case.

17             So your question is a little imprecise in

18  that regard.  Do you get my point?

19             MR. TUFTS:  Okay.  I do.  It's well

20  taken.

21             MR. SHAFFER:  Okay.  Now, you know, I

22  think, because we produced evidence of this in

23  discovery, that MidCap was performing its due

24  diligence in the spring of 2013, prior to the

25  issuance of its commitment letter on June 14th.

1    briefly.  Just looking at the first couple pages, does

2    this refresh your memory about whether or not this is

3    the message you left on August 3rd?

4              MR. SHAFFER:  Objection to the form of the

5    question.  I don't think he can say whether this is the

6    message he left, because that would require him to know

7    whether the transcript is accurate with the tape.

8              If you want to ask him does this transcript

9    refresh his recollection as to whether he communicated

10   using the voicemail exchange on August 3rd, you can ask

11   him that question.

12             But I don't think you can ask him, based on

13   this transcription, whether this is the conversation

14   that he had with the voicemail exchange on August 3rd.

15             MR. TUFTS:  Can we go off the record?

16             (Thereupon, there was a recess taken at

17   11:31 a.m.)

18             (Thereupon, the proceedings were resumed at

19   11:33 a.m.)

20             MR. TUFTS:  For the record, I'm playing the

21   audio recording that is on the disk marked as Exhibit

22   7.

23             Good afternoon.  This is George Hepburn.  It

24   is Saturday afternoon, August the 3rd.  I have some

25   very important information to get across to the

 1   management team, and this will be -- my advice is to

 2   listen to this a couple of times so that you hear the

 3   words and get the best understanding of the situation

 4   the way it actually is.

 5           It's not a well-defined situation.  There are

 6   certain aspects that are well defined and certain

 7   things that are going to play out over the next few

 8   days as I get more information from my legal team,

 9   actually, that is working to help us with this, and

10   it's got to do with the banking.

11           BB&T, and I'm certain you are well aware

12   because of prior messages over the past two years,

13   is -- is turning up the pressure to the fullest extent

14   possible to get repaid every dime that they are owed as

15   quickly as possible.

16           And what that is resulting in is they've

17   actually taken the position that all the money we are

18   putting in to the bank at BB&T, they are just taking it

19   and paying down the line of credit that we have.  That

20   is a nine-million-dollar line of credit.

21           So in the last three days, they have actually

22   gotten close to a million dollars paid back, and the

23   11.4 million that we once owed them that was on a

24   steady pay-down is now down to a little more than $10

25   million.

1          As you might imagine, if they keep doing

2     that, they will get paid back very quickly, because we

3     collect five to $6 million a month.  And if they keep

4     doing that, they will get their money back in 60 to 90

5     days, but no checks will get paid.  So that's not a

6     scenario that is going to be able to work.

7          Lo and behold, they did, in fact, start

8     bouncing checks, I just saw that this morning.  When I

9     looked at the bank reports, they started bouncing all

10    the checks that were written that had not yet been paid

11    through Thursday and Friday.  They paid a few on

12    Friday, and they paid everything through Wednesday that

13    was presented.

14          And then Thursday, they made some payments,

15    and yesterday they made some.  But then they stopped

16    paying.  And it certainly isn't for a lack of cash or a

17    lack of us being profitable.  It's just they have run

18    out of patience because they thought that by now, that

19    company I have talked about, MidCap Financial, would

20    have resulted in a refinance.

21          And they, unfortunately, have a very

22    destructive, irrational, and I have to use the word

23    evil, person in the name of Eric Hubbard who is in

24    charge of the account down in Atlanta, Atlanta,

25    Georgia.  Now, he is in charge of the account, and he

1    doesn't care at all about what is happening, other than

2    just he needs to get the money paid back and he's run

3    out of patience.

4           He's run out of patience because we have been

5    working hard to be refinanced, and we have, I can tell

6    you every effort has been expended to take the debt

7    that we owe to BB&T and have that paid by another

8    lender.

9           But, unfortunately, with the presence of the

10   Department of Justice having this whistleblower suit

11   present and not being able to settle it out of court,

12   which I made a substantial offer to the federal

13   government to settle out of court to get them to just

14   go away, without that out of the way, no other person,

15   other than friends and family, would step up and lend

16   me or the company $11 million, knowing that that

17   lawsuit is pending.

18          Because potentially, that lawsuit could

19   result in 10, 15, $20 million owed.  It's theoretically

20   possible.  My opinion, and the opinion of my lawyers,

21   is it's not going to be anywhere near that, and in my

22   opinion, it's going to be zero because there is no

23   false claims that we've ever submitted.  That means you

24   intentionally defraud Medicare.  And we have never,

25   ever done that.

1          But that's a battle that is going to be

2    played out down the road.  Unfortunately, that battle

3    is going to be played out in three to four or five

4    months.  And BB&T has run out of patience.

5          Now, why?  I don't know.  I don't know how

6    they operate, unless these federal regulators or

7    something that is causing irrational destructive

8    behaviors to occur in the banking industry when you are

9    in a category that we are in, which is, you know, we

10   are not bad.  We are good.

11         But according to the bank, we are in their

12   workout department.  Once you get in there, they want

13   you to pay them back.  If you put -- God, if you put a

14   reckless person in charge of the account -- and by the

15   way, I was told by a couple legal people and some other

16   bankers that this department was newly formed by BB&T

17   about two years ago, and that, quote, they don't know

18   what they are doing, end quote.

19         But we are subjected to it.  And maybe this

20   will come out in court eventually so that they get

21   their hands slapped real hard, and I'm going to try to

22   do that.  I do have a legal team working on this, and a

23   good one, that is looking to stop them from this

24   destructive behavior of not giving any money back to us

25   for all the money that's paid in to the line of

1   credit -- excuse me -- paid in to their bank.  They

2   just take it all and pay the line of credit down.

3           Obviously, unless we do something else, we

4   are not going to be able to keep operating as a

5   business if I just let that play out.  So there are two

6   approaches.  One, I met with a group of lawyers Friday

7   and they are looking at it, and I'm going to get an

8   opinion Monday, that will say whether we can go in to

9   court and have a good chance of getting a court

10  injunction to impose a -- what I had proposed was a

11  12-month payout, because I knew BB&T was not satisfied

12  with just getting the $300,000 a month from us in

13  payments, which we have made like clockwork, steady

14  Eddie, never missed a payment, never late, paid the

15  interest, 100,000 interest a month, 200,000 in

16  principal, close to that.

17          And for years -- well, it has been four

18  years, we have been steady Eddie.  As I may have

19  mentioned to you before, we owed 18 million and it's

20  down to 10 and a half today.  It has been steady.  It

21  was 11.4 on a regular basis.  Then they swiped out 900

22  to a million dollars, 900,000 to a million dollars in

23  the past three days, because that is how much we have

24  collected between Wednesday, Thursday and Friday.  They

25  just swiped swipe it out and pay down the line of

1   credit.

2          So that is kind of -- that's where we are.

3   Now, back to -- we can't operate this way, of course.

4   I have got plans to avert and minimize the damage that

5   they are now imposing.  I have got the legal team on

6   it.  We hope that Monday -- I hope and pray that I will

7   be able to go in court and pose what they agreed to,

8   which is if MidCap doesn't come through with the

9   financing, that they would agree to what I consider a

10  harsh repayment 12 months, a 12-month repayment plan,

11  where I am paying them almost a million dollars a

12  month.  It actually starts out smaller and then it

13  ramps up.  And we can do that.

14          With that, however, we are still going to

15  have to go through layoffs, and it would be probably

16  200 people that we would have to lay off.  And that

17  would be a layoff that if that scenario plays out where

18  we get a court injunction on, you know, this week

19  sometime and we lay off 200 people, that would be a

20  layoff that I would not be saying:  Hey, we are going

21  to call you back.

22          We would just pick the people, there are 661

23  employees at Dynasplint today, and there would be 200

24  laid off and then we see how we go, you know, within a

25  year.  I want to make sure we pay them back on time if

1    this court injunction works, this effort.  I will find

2    that out Monday whether that is going to be a ploy that

3    can be quickly engaged.

4         Now, if that doesn't happen, then it goes to

5    Plan B.  Plan B is very destructive but not completely

6    destructive.  It's just -- it's hurtful.  And that

7    would be a much larger layoff that I then would declare

8    is a temporary layoff, temporary meaning three to five

9    months.  There will be a three- to five-month layoff of

10   a lot of people.  It might be up to 500 people.

11        And over that next ensuing weeks and several

12   months, in three to four months, we would have enough

13   money coming in from the work we've already done, the

14   good work that you guys have already done, and the

15   billings that would continue from the 30,000 units that

16   we would then still have to bill for, which would stay

17   in rent for five months.  And also I would keep

18   probably all the President's Club sales -- sales

19   consultants.

20        And then some of the sales managers that are

21   getting this message would have to become sales reps.

22   The regional sales managers and any divisional, and I

23   don't think this is going to the regionals at this

24   point -- forgive me if it is or if it isn't --

25   eventually, you can convey this to them because

1  everybody needs to be on the same page, I just don't

2  want to give a message that I then will give another

3  message Tuesday with the final game plan.

4           I'm prepping you now because checks are

5  bouncing, and, you know, we had to cancel the training

6  that was occurring in Annapolis.  That is raising a lot

7  of feathers wondering what is going on.  So I have to

8  give you some information here.

9           I'm giving you everything I have.  I hope you

10 just fully understand it.

11          But Plan B -- Plan A is we would have to lay

12 off 200 people anyway and pay them back in 12 months.

13 That is if I can get the court injunction and that

14 works, and they are forced to accept what they already

15 agreed to.

16          See, this 12-month plan was laid out as kind

17 of like a-worst-case scenario plan, and they adopted

18 it, said they would.  Now they are not abiding by it.

19 So I'm going to sue the bank.  But for right now, I

20 just want to get a court injunction saying yes, they

21 will, they have to abide by it.

22          It's in writing, and my one lawyer said yeah,

23 this is the operative document for repayment, but that

24 still requires 200 people to be laid off.  Just keep

25 that in mind, if you can keep that thinking going on.

1    I have talked to my accountant who has been with me for

2    30 years and he said:   George, in the end, you will be

3    stronger when you come out of that.   Yes, and we will

4    be debt free.

5            That's good because I spend about one and a

6    half million in interest and fees a year on this debt.

7    Because they have raised the interest rates.   The fees

8    are terrible.   They have just been ripping us off.

9    That will be going away.

10           Then if that doesn't work though, if I can't

11   get the court injunction, we have got to resort to Plan

12   B which is the harsher temporary layoff.   I have to say

13   temporary because -- for a lot of reasons.   But let's

14   just look at it that way.

15           It is a temporary layoff.   Everybody that is

16   laid off would be welcome to come back once the bank

17   debt has expired.   And that is why I would do the high

18   number to ensure getting this debt paid back and I have

19   done the math and -- well, I have worked over with Matt

20   Petty, Doug Pitts, Marsha, I have included Jonathan

21   Shopp and Jim Shocky.

22           It works.   It works to do it that harsh and

23   get that debt paid off, and then we are out of debt and

24   one huge problem goes away, and the bigger, more

25   dangerous one actually.

1          Then we still have to deal with the

2   Department of Justice, but that will play out over

3   many, many months, and I'm firm in thinking that that

4   will be okay.

5          So it's -- these two things are related, of

6   course, because with the Department of Justice there,

7   it's preventing the refinance.  It's not making banks

8   feel comfortable.  But I'm telling you this behavior

9   that BB&T is doing is destructive and in violation, I

10   believe, of federal good faith lending practices.  And

11   I'm going to sue the bank for this.

12          But first things first, we've got to survive.

13   What I will do is I have other money from my retirement

14   account that I'm going to take out and continue to

15   operate the business.  We will replace all the bounced

16   checks through this week, and we will start operating

17   out of a different bank.  And that's what I'm going to

18   do.

19          It's no secret.  Don't tell too many people

20   because they are going to try to stop this, BB&T will.

21   I'm going to operate out of Wells Fargo for a while,

22   and then I will operate out of a different bank.  I'm

23   just going to have to do what I have to do until they

24   are paid in full or a court injunction stops, and we

25   will just pick up the pieces and go.

1           Business will be hurt, but our product line

2    is still going to be needed six months or even a year

3    for whatever part of the lost business we have to

4    incur, because we are the dominant player, and things

5    aren't going to change that fast.

6           So we got to get through this period where

7    this irrational, terrible bank is taking this harsh,

8    totally uncalled for action.

9           That is the story.  That is what is

10   happening.  I hope I have explained it enough.  I know

11   there are going to be a lot of other questions.  But I

12   want you to know why we had to cancel the training and

13   how I am going to approach getting those checks that

14   are going to bouncing paid for, and what the bank's

15   actually doing.

16          They are just taking all the money they can

17   and paying down the line of credit.  Once it's done to

18   zero, then there is no more action.  The debt has to be

19   repaid.  It's just they are wanting to be repaid

20   tomorrow.  They are doing everything they can to do

21   that.

22          I have put everything behind this.  I have a

23   house on the line.  My lawyer did say:  You don't have

24   to worry.  Your house isn't going to be taken away, my

25   one lawyer.  The laws are such it's hard and the bank

1   will be paid out by then.

2          I have played in good faith with them.  I've

3   dealt straight up and given them every security

4   possible.  The collateral is more than double the debt,

5   and yet it's still not good enough.  Shame on BB&T.

6          So that's the message.  And I will be in

7   Monday and I will be at the phone for anybody who wants

8   to speak.  Take care.  Have a good weekend I know this

9   isn't exactly going to light up your weekend delight.

10          But let's deal with it.  Thank you.  And keep

11   working the best you can.  Thank you so much.  Bye-bye.

12          Are you okay do you need a break?

13          THE REPORTER:  No.  I'm fine.

14   BY MR. TUFTS:

15     Q.   Mr. Hepburn, is that an accurate recording of

16   the call or message you left --

17          MR. SHAFFER:  Objection to the form of the

18   question.

19   BY MR. TUFTS:

20     Q.   -- on August the 3rd, 2013?

21          MR. SHAFFER:  Lack of foundation.  You can

22   answer.

23     A.   It seemed accurate to me.

24   BY MR. TUFTS:

25     Q.   Can we stipulate that this transcript

1      A.    I don't recall.

2      Q.    On August 6th, 2013, you laid off 500 DSI

3   employees.  Is that correct?

4            MR. SHAFFER:  Objection to the form of the

5   question.

6      A.    I don't believe that's accurate.

7   BY MR. TUFTS:

8      Q.    Did you ever tell BB&T that you laid off 500

9   employees of DSI on August 6th, 2013?

10     A.    I may have as an estimate.

11     Q.    What was that estimate based on?

12     A.    An assumption of laying off about two-thirds

13  of the people.

14     Q.    When was it first decided this layoff would

15  be done?

16     A.    August 3rd, Saturday, August 3rd.

17     Q.    Who made the decision?

18     A.    I did.

19     Q.    How was the layoff implemented?

20     A.    It was implemented by conducting a meeting at

21  5 p.m. Monday, August 5th, by teleconference and on --

22  in person for those managers that could be in person,

23  and it was discussed at that time what we had to do in

24  order to pay BB&T back in three months.

25            And they were instructed -- the managers were

1  instructed to identify a rough number of about 180

2  people that they wanted to keep, and then everybody

3  else would be let go on a planned temporary layoff for

4  most of them, but not all of them.

5      Q.    Was it only managers that attended the

6  teleconference or in-person meeting on August 5th?

7      A.    I believe so.

8      Q.    Did you distribute any termination notice?

9            MR. SHAFFER:  Did he personally?

10           MR. TUFTS:  Yes.

11           MR. SHAFFER:  Did you send any termination

12  notices to any of the employees who were terminated on

13  August 6th?  Did you personally?

14           THE WITNESS:  I don't recall.  Probably.  I

15  don't recall.  I may have, but I know most of them are

16  not --

17           MR. TUFTS:  This was -- what I have provided

18  to you is marked as Exhibit 1 to the deposition of Dana

19  Lynn Ridge.  It's a two-page letter dated August 6,

20  2013, addressed to Dynasplint colleagues.

21           THE WITNESS:  Yes.

22  BY MR. TUFTS:

23      Q.    Is that your signature on the second page?

24      A.    Yes.

25      Q.    Did you draft this letter?

```
1        A.    Yes.

2        Q.    When did you draft it?

3        A.    Probably that morning.

4        Q.    The morning of August 6th?

5        A.    Probably.

6        Q.    Did you have any assistance from anybody in

7   drafting this letter?

8        A.    I probably had a couple people read it.

9        Q.    Who did you have read it?

10       A.    I don't recall.

11       Q.    Did you have any attorneys read it?

12       A.    I doubt it.

13       Q.    And did you distribute this letter?

14       A.    I did.

15       Q.    Who did you distribute it to?

16       A.    I gave it to all the managers and they gave

17   it to the people.

18       Q.    Did you e-mail this letter to anybody?

19       A.    I didn't -- I may have.

20       Q.    Who did you e-mail it to?

21       A.    I don't recall.  It certainly would have been

22   to people outside of my direct reach.

23       Q.    Was this letter delivered to every DSI

24   employee that was laid off on August 6th, 2013?

25       A.    It was intended to be.
```

1   Department of Justice regarding the qui tam litigation?

2        A.    Yes.

3        Q.    Who was conducting the negotiations and

4   discussions on behalf of DSI with the Department of

5   Justice in July of 2013?

6        A.    Alston & Bird and probably Ted Kang.

7        Q.    Were you in regular communication with

8   Mr. Kang about that?

9        A.    I'm certain I was.

10       Q.    I don't want you to tell me anything that

11   Mr. Kang told you.  But what was your understanding

12   with respect to the status of the settlement

13   negotiations with the Department of Justice after July

14   10th, 2013?

15       A.    We were waiting to hear back from them to

16   accept an offer we had made.

17       Q.    Did you ever -- did you ever come to

18   understand whether the government was willing to enter

19   in to a negotiated settlement with respect to the qui

20   tam case in July of 2013?

21       A.    They were willing to enter into negotiation.

22       Q.    When did you -- did you -- did there come a

23   time in July of 2013 when you believed that DSI's

24   ability to enter into a negotiated settlement with the

25   Department of Justice would not come to fruition on or

1    before July 31st, 2013?

2       A.    No.

3       Q.    Okay.  Do you remember telling Mr. Hubbard in

4    late July 2013 that you didn't think the MidCap loan

5    refinancing would close by the July 31st, 2013,

6    deadline set forth in the then extant forbearance

7    agreement with BB&T?

8             MR. TUFTS:  Objection.

9       A.    I believe I do recall telling him that we

10   wouldn't close in time for July 31st.

11   BY MR. SHAFFER:

12      Q.    Okay.  Did you have an understanding in July

13   of 2013 as to when BB&T expected the MidCap Financial

14   loan closing to close by?

15      A.    Yeah.  They thought it would close by July

16   31st.

17      Q.    And did you come to understand at some point

18   in time in July of 2013 that that was not going to

19   occur?

20      A.    I believe it was the last few days, like the

21   last two days.

22      Q.    Okay.  So -- and did you do anything at that

23   time to try to reach out to Mr. Hubbard to report to

24   him on your understanding as to whether it was feasible

25   to complete the MidCap Financial loan closing by July

1   31st, 2013?

2       A.    I believe I did.

3       Q.    And did you ever hear back from Mr. Hubbard

4   about that?

5       A.    No, I did not.

6       Q.    Did you have an understanding at that time as

7   to what Mr. Hubbard's plans were or what BB&T's plans

8   were with respect to the loans that would mature on

9   July 31st, 2013?

10      A.    My expectation was they would just move ahead

11  like they always did and give us another forbearance

12  agreement.

13      Q.    Were you still hopeful that you would be able

14  to reach a negotiated settlement with the Department of

15  Justice sometime after July 31st, 2013?

16      A.    Absolutely.  Yes.

17      Q.    When was your first -- when was the first

18  date when you realized that BB&T was not willing to

19  continue to forbear or not collect on its loans to DSI?

20      A.    Not absolutely until the morning of Saturday,

21  August 3rd.

22      Q.    And what transpired on Saturday, August 3rd,

23  that led you to believe that BB&T was not willing to

24  continue to forbear on collection of its loans to DSI?

25      A.    Every check that was presented, including a

1   payroll check -- excuse me -- including our payroll for

2   Friday, August 2nd was returned and did not go through

3   the bank.  No checks whatsoever went through the bank

4   account on August 3rd, meaning they all bounced.

5          And I knew then that nothing was going to be

6   ever paid again out of BB&T willingly unless I got a

7   court order to stop it.

8          Q.   And did you have some notice or indication

9   that there was some irregularity with respect to the

10  banking relationship between DSI and BB&T a few days

11  prior to Saturday, August 3rd?

12         A.   Yes.

13         Q.   What did you discover and when?

14         A.   I discovered on the morning of August 1st,

15  Thursday, August 1st, that some of the checks were not

16  paid and they were returned, but some of the checks

17  appeared to go through.  So it was not clear to me what

18  was happening.

19         Q.   And the checks that went through, did you

20  notice when they had been presented to the bank for

21  payment?

22         A.   Yes.  They had been presented that night,

23  July 31st.

24         Q.   Okay.  And were there any checks that were

25  presented for payment after July 31st for which the

1   bank did not dishonor the checks?

2        A.     Correct.  One more day.

3        Q.     There were checks presented on August 1st

4   that you believe had been paid?

5        A.     Yes.

6        Q.     There were checks that were presented on

7   August 1st that were not paid.  Is that correct?

8        A.     Yes.

9        Q.     The checks that were dishonored on August

10  1st, were they large checks or do you remember anything

11  about the size of the checks?

12       A.     I don't remember anything about the size of

13  the checks.

14       Q.     Did you continue, after July 31st, 2013, to

15  attempt to reach a resolution with respect to the qui

16  tam litigation with the government?

17       A.     Yes.

18       Q.     And have those efforts continued since then?

19       A.     Yes.

20       Q.     You indicated in your letter to your

21  employees on August 6th, 2013, that you had -- you were

22  hopeful or that your plan was to recall or start

23  recalling some of the laid-off employees, I believe as

24  of November 2013.  Do you remember that?

25       A.     Yes.

1      A.    I recall August 10th being a date, something

2    around that time.

3      Q.    You indicated in your -- in your -- in your

4    prior communications in August 2013 that you were

5    consulting with lawyers about whether BB&T's sweeping

6    of the accounts would be stopped?

7      A.    Correct.

8      Q.    Do you remember that testimony?  Now, did you

9    have an understanding at any point in time as to

10    whether or not BB&T could legally attach the

11    receivables that were being paid to DSI by Medicare?

12      A.    No.  I thought that was illegal.

13      Q.    When you said that you were consulting with

14    lawyers in early August 2013, do you know who you were

15    consulting with at that time?

16      A.    Yes.

17      Q.    Do you know who it was?

18      A.    Andrew Graham.

19      Q.    Did you come to be represented by Mr. Graham?

20      A.    No.

21      Q.    When you wrote your letter of August 6th,

22    2013, to employees notifying them that DSI would have

23    to implement certain layoffs within the company, did

24    you have an understanding of the precise number of

25    people that would be -- that you hoped to recall later

1    on?

2        A.    I had an idea.

3        Q.    Okay.  But did you know the exact number?

4        A.    No.

5        Q.    What did that depend on?

6        A.    Getting BB&T paid in full by a certain time

7    period.

8        Q.    Okay.  And did you have an expectation as of

9    August 6th, 2013, with respect to that which did not

10   come to fruition as a result of other events?

11       A.    Yes.

12       Q.    What was that?

13       A.    That was the beginning of November, that I

14   would have them all paid off by October 31st.

15       Q.    What happened in between August 6th, 2013,

16   that caused your original idea that you would be able

17   to begin calling back employees as of November, what

18   happened during that time period to change that plan?

19       A.    Medicare suspended our payments.

20       Q.    You were asked some questions about

21   communications that you had with BB&T in February of

22   2013 with respect to what you testified to as Plan B.

23   Do you remember that testimony?

24       A.    Yes.

25       Q.    You indicated to Mr. Hubbard in February of

1    2013 that one of the potential plans of action for the

2    company would be to lay off some employees as of

3    that -- at some point in time, correct?

4         A.    Correct.

5         Q.    You weren't -- were you planning to lay off

6    employees in February of 2013?

7         A.    No.

8         Q.    What you and Mr. Hubbard were talking about,

9    was that a theoretical discussion based on some future

10   events?

11        A.    No.

12        Q.    Did you know in February of 2013 that it

13   would be necessary for you to lay anyone off?

14        A.    No.

15        Q.    What were you telling Mr. Hubbard about a

16   Plan B to lay off employees in February of 2013?  Why

17   were you telling him about that?

18        A.    Because his boss, Richard Spencer, indicated

19   to me that if we could get refinanced by the end of

20   June, everything would be fine.  And if not, then he

21   would want to have that Plan B put in to effect.

22        Q.    So is it correct that the Plan B was a future

23   contingency plan in the event certain things didn't

24   occur?

25        A.    Correct.

1      Q.    Did that contingency plan get superseded by

2   subsequent events after that date?

3      A.    Could you explain that again?

4      Q.    Sure.  The Plan B, as I understand it, was

5   that a contingency plan that would occur if the BB&T

6   loans did not get extended past June 15th of 2013?

7      A.    Yes.

8      Q.    And they did get extended beyond that date?

9      A.    That's correct.

10      Q.    So that Plan B, was that superseded by events

11   that occurred after June 15th, 2013?

12      A.    Yes, it was.

13      Q.    Did that make the Plan B no longer operative?

14      A.    For that time period, correct.

15      Q.    The reason why it was no longer operative is

16   because BB&T continued to forbear on the loan.  Is that

17   correct?

18      A.    That's correct.

19      Q.    They continued to forbear through July 31st,

20   2013?

21      A.    That's correct.

22      Q.    Your understanding was by agreeing to forbear

23   through July 31st, 2013, they could not and would not

24   take any action with respect to the loans, correct?

25      A.    Absolutely.

1     Q.    How often was BlackBriar in your -- DSI's

2  offices in June and July of 2013?

3     A.    I believe they were there at least one day a

4  week, sometimes two.

5     Q.    What was your understanding of what

6  BlackBriar was doing?

7     A.    They were there to report back to the bank

8  what was happening from an accounting standpoint.

9     Q.    Do you recall in July of 2013 if BlackBriar

10  Advisors was making inquiries of DSI with respect to

11  the status of the negotiations that were then ongoing

12  with the Department of Justice regarding the settlement

13  of the qui tam litigation?

14     A.    I don't recall that.

15     Q.    Do you recall whether in July of 2013 there

16  was a delay in hearing back from the Department of

17  Justice about whether it would be feasible to enter

18  into a negotiated settlement on an inability to pay

19  basis?

20     A.    I recall that there was a delay.

21     Q.    Do you remember whether DSI was required, as

22  part of the ongoing negotiations with the Department of

23  Justice in the qui tam case, whether it was required to

24  provide financial information and other information to

25  the Department of Justice to demonstrate DSI's

1    inability to pay a substantial amount of money?

2        A.    I recall that.

3        Q.    And do you recall whether in July of 2013,

4    the Department of Justice lawyers with whom your

5    counsel was negotiating, whether they ever expressed a

6    desire to interview MidCap Financial?

7        A.    Yes.

8        Q.    And do you remember why they wanted to do

9    that?

10       A.    I don't recall why.

11       Q.    Do you remember when that occurred?

12       A.    It was in July, I believe.

13       Q.    Okay.  And do you remember whether MidCap

14   Financial agreed to do that?

15       A.    I recall they refused to do it.

16       Q.    Okay.  Do you know why?

17       A.    They thought it was inappropriate for them in

18   any way to talk to the Department of Justice.

19       Q.    Did they at that time -- was it your

20   understanding that they were still willing to proceed

21   with a refinancing in the event that the qui tam case

22   could be resolved?

23       A.    Absolutely.  They were going to go forward,

24   yes.

25       Q.    Now, I want to redirect your attention to

 1   Hepburn 17, which is a July 19th, 2013 e-mail from

 2   Mr. Ciatto.

 3          Do you see that?

 4      A.   Yes.

 5      Q.   In that, Mr. Ciatto refers to an agreement to

 6   settle the OIG situation for an amount of $2 million or

 7   less.

 8          Do you see that?

 9      A.   Yes.

10      Q.   Is that different from what you had been told

11   earlier by MidCap Financial?

12      A.   Yes.

13      Q.   What had they told you before?

14      A.   They told me if we could get it settled for

15   three to four million, they could move ahead and it

16   wouldn't be any problem.

17      Q.   Did they indicate in July of 2013 why the

18   amount of the settlement had changed?

19      A.   They may have.

20      Q.   Do you remember what they told you?

21      A.   No, but I might have an idea.

22      Q.   I don't want you -- as of July 19th, 2013,

23   was DSI still pursuing a settlement of the qui tam

24   litigation with the Department of Justice in an amount

25   of $2 million or less?

1      A.    Yes.

2      Q.    And did those efforts continue beyond July

3  19th, 2013?

4      A.    Yes.

5      MR. SHAFFER:  I have no further questions

6  thank you.

7      MR. TUFTS:  Just a few follow-ups.  We are

8  almost done.

9  FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFFS:

10  BY MR. TUFTS:

11      Q.    Mr. Hubbard -- I'm sorry.  I know you don't

12  like being called that.  Mr. Hepburn -- I apologize --

13  did you ever tell BB&T or Mr. Hubbard that MidCap told

14  you that they could close the refinancing deal with ten

15  days of you settling the DOJ litigation?

16      A.    Could you repeat the question?  I'm sorry.

17      Q.    Sure.  Did you ever tell BB&T or Mr. Hubbard

18  that MidCap had told you that it could settle the

19  refinancing deal, close it, within ten days of the qui

20  tam action being settled?

21      A.    I would be shocked if I did not.

22      Q.    That is a yes?

23      A.    I believe I did.

24      Q.    So when did you tell them that?

25      A.    At any time that they would have asked.

```
1      Q.     Do you recall the first instance when you

2   told them that?

3      A.     No.  No.

4      Q.     So if it would -- did you believe that, that

5   MidCap would be able to close within ten days of you

6   settling the qui tam action?

7      A.     Absolutely, yes.

8      Q.     What was the status of the negotiations of

9   the qui tam action as of July 20th?

10     A.     Ted Kang was pounding on their doors to try

11  to get them to give an answer.

12     Q.     Was there any answer around that time?

13     A.     I don't know.  I didn't get an answer

14  conveyed back to me.

15     Q.     What about over the next couple of days,

16  20th, 21st, 22nd, was there any movement in the

17  settlement negotiations during that time period?

18         MR. SHAFFER:  I'm going to object to that

19  question.  I mean, you can ask him if he had an

20  understanding as to what the status of the negotiations

21  were, but I don't think you can ask him a question that

22  is, at least implicitly, designed to find out something

23  that was told to him by his lawyer.

24         So I would object on that basis.

25  BY MR. TUFTS:
```